**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JASON MINTON | § | |
| | § | |
| v. | § | |
| | § | |
| INTERCONTINENTAL TERMINALS | § | |
| COMPANY LLC; NSK CORPORATION; | § | |
| NSK PRECISION AMERICA, INC.; | § | Cause No. _____ |
| NSK-AKS PRECISION BALL COMPANY; | § | |
| NSK, LTD.; APPLIED INDUSTRIAL | § | |
| TECHNOLOGIES, INC.; UNLAUB / | § | |
| CHANNEL BEARING & SUPPLY and | § | |
| THE UNLAUB COMPANY, INC. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff JASON MINTON (referred to as "Plaintiff") files this Original Complaint and would respectfully show the Court as follows:

### I.      PARTIES AND SERVICE

1.      Plaintiff, JASON MINTON, is an individual who resides in Harris County Texas.

2.      Defendant, INTERCONTINENTAL TERMINALS COMPANY, LLC, is a limited liability company authorized to conduct business in the State of Texas.  ITC's sole member, Mitsui U.S.A., is a New York Corporation with its principal place of business in New York.  ITC operates a facility in Harris County, Texas (the "ITC Facility").  ITC maintains a corporate office at 1021 Main Street, Suite 1150, Houston, Texas 77002-6508.  ITC has been served with process and filed answers in the underlying state court matters and has entered an appearance herein. **SUMMONS IS HEREBY REQUESTED.**

3.      Defendant NSK CORPORATION ("NSK Corp.") is a foreign corporation located at 4200 Goss Road, Ann Arbor, Michigan 48105.  NSK is incorporated under the laws of the State of Delaware, has its principal place of business in Michigan, and is authorized to conduct business

in the State of Texas. NSK may be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701. **SUMMONS IS HEREBY REQUESTED.**

4.     Defendant NSK PRECISION AMERICA, INC. ("NSK Precision") is a foreign corporation incorporated under the laws of the State of Delaware with its principal place of business at 3450 Bearing Drive, Franklin, IN 46131. NSK Precision does not maintain a registered agent for service of process in the state of Texas, but may be served process through the Texas Long-Arm Statute, Texas Civil Practices and Remedies Code, § 17.044, by service of duplicate copies of process on the Texas Secretary of State and can be served with process through its registered agent for service of process in the State of Delaware, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. **SUMMONS IS HEREBY REQUESTED.**

5.     Defendant NSK-AKS PRECISION BALL COMPANY ("NSK-AKS") is a foreign corporation located at 1100 N. 1st Street, Clarinda, Iowa 51632. NSK-AKS is a Delaware corporation with its principal place of business in the State of Iowa. NKS-AKS does not maintain a registered agent for service of process in the State of Texas, but may be served process through the Texas Long-Arm Statute, Texas Civil Practices and Remedies Code, § 17.044, by service of duplicate copies of process on the Texas Secretary of State and can be served with process through its registered agent for service of process in the State of Delaware, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. **SUMMONS IS HEREBY REQUESTED.**

6.     NSK, LTD. ("NSK Ltd.") is a foreign business entity located at the Nissei Building, 1-6-3 Ohsaki, Shinagawa-Ku, Tokyo, 141-8560, Japan. NSK Ltd. has sufficient business contacts with the State of Texas for the purpose of accumulating monetary profit, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for

causes of action arising out of such business done in the State of Texas. For these reasons, service of process is to be made pursuant to Rule 4(f), Federal Rules of Civil Procedure, by and through the *Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, done at The Hague, November 15, 1965. 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. Said documents are to be forwarded to the Central Authority of Japan as required by The Hague Convention, to wit: Hague Convention Division, Consular Affairs Bureau Ministry of Foreign Affairs, 100-8919 Kasumigaseki 2-2-1, Chiyoda-ku, Tokyo, Japan. Plaintiff would further show that NSK, Ltd. engages in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in the State of Texas, and therefore, service of process is authorized under Section 17.044(b) of the Texas Civil Practice & Remedies Code by serving the Secretary of State of Texas as agent for NSK, Ltd. **SUMMONS IS HEREBY REQUESTED.**

7.     Defendant APPLIED INDUSTRIAL TECHNOLOGIES, INC. ("Applied") is a foreign corporation that is authorized to conduct business in the State of Texas. It may be served through its registered agent, Cogency Global, Inc., at 1601 Elm Street, Suite 4360, Dallas, Texas 75201. Applied is organized under the laws of the State of Ohio and has its principal place of business at 1 Applied Plaza, Cleveland, Ohio 44115-5030. **SUMMONS IS HEREBY REQUESTED.**

8.     Defendant UNLAUB / CHANNEL BEARING & SUPPLY LLC ("Channel Bearing") is a limited liability company organized under the laws of the State of Oklahoma. Upon information and belief, its sole member is Defendant The Unlaub Company, Inc., a foreign corporation organized under the laws of the State of Oklahoma and with its principal place of business in Oklahoma. Channel Bearing is located at 1722 E. King Place, Tulsa, OK 74110.

Despite doing business in the State of Texas, Channel Bearing does not have a registered agent for service within the State. Channel Bearing may be served process through the Texas Long-Arm Statute, Texas Civil Practices and Remedies Code, § 17.044, by service of duplicate copies of process on the Texas Secretary of State and can be served with process through its registered agent for service of process in the State of Oklahoma, R.B. Coulter, 1722 E. King Place, Tulsa, OK 74110. **SUMMONS IS HEREBY REQUESTED.**

9.      Defendant THE UNLAUB COMPANY, INC. ("Unlaub") is a foreign corporation incorporated under the laws of the State of Oklahoma and with its principal place of business in Oklahoma. It is located at 6 E 5th Street, 4th Floor, Tulsa, OK, 74103. Unlaub does not maintain a registered agent for service of process in Texas, but may be served process through the Texas Long-Arm Statute, Texas Civil Practices and Remedies Code, § 17.044, by service of duplicate copies of process on the Texas Secretary of State and can be served with process through its registered agent for service of process in the State of Oklahoma, James L. Sneed at 6 E 5th Street, 4th Floor, Tulsa, OK, 74103. **SUMMONS IS HEREBY REQUESTED.**

### III.      JURISDICTION AND VENUE

10.      Jurisdiction exists pursuant to 28 U.S.C. § 1332(a), on the basis of diversity of citizenship.

11.      Harris County is the appropriate jurisdiction because Defendants, at the time of the events in question, were doing business in Harris County, Texas, in a continuous and systematic way, and Plaintiff's claims arise out of Defendants' specific contacts with the forum. Defendants ITC and Channel Bearing are at home in Harris County because their principal places of business are in Harris County, Texas. Defendants are also subject to jurisdiction in this Court due to their commission of a tort in Harris County, Texas. TEX. CIV. PRAC. & REM. CODE § 17.042(1). The subject matter in controversy is within the jurisdictional limits of this Court.

12.     Venue is proper in Harris County, Texas because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Harris County, Texas.  TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1).

### IV.     FACTUAL BACKGROUND

**A.     The Incident.**

13.     The ITC Facility is a large petrochemical terminal along the Houston Ship Channel. The ITC Facility is approximately 265 acres and at the time of the incident described below (the "ITC Incident") contained 242 tanks with a storage capacity of 13 million barrels.  ITC receives and services its customers' products by ship, barge, pipeline, rail, and truck.

14.     This lawsuit stems from a March 17, 2019 fire and explosion that occurred at the ITC Facility. The fire began when butane was being injected into Tank 80-8, which contained naphtha, a volatile substance used to create octane-boosting components for gasoline.  The fire occurred when the Tank 80-8 manifold had a catastrophic failure causing the butane to vaporize and ignite. The portion of the facility where the fire occurred contained fifteen storage tanks in three rows of five.  Tank 80-8 was located approximately in the middle of the tank farm. Notably, there was no foam fire suppression system in place and no access to dry chemical fire suppression or foam, which would have quickly extinguished the blaze. Therefore, the fire burned uncontrolled and spread to adjacent Tanks 80-2, 80-3, 80-5, 80-6, 80-11 and 80-13.

15.     The fire continued to rage fueled by chemicals contained in the multiple storage tanks that were compromised by the fire and a dark black cloud of smoke engulfed the surrounding area for miles. Additional tanks caught fire, and approximately 11 tanks were actively burning and releasing air contaminants on March 18 through 19, 2019. The tanks contained gasoline blend stocks and components, such as xylene, toluene and pyrolysis gasoline (which contains the

carcinogen benzene). The fire was put out for several hours on March 20, 2019, but in the evening

a tank re-ignited and was subsequently extinguished.

16.    On March 21 and 22, 2019, benzene emissions caused by the damaged tanks

resulted in a shelter-in-place for residents in Deer Park and La Porte and local school districts were

closed. On multiple occasions air quality tests revealed Benzene and other volatile organic

compound (VOC) readings in excess of the action levels set by the Occupational Safety and Health

Administration (OSHA). In fact, an air monitoring report revealed 51 benzene detections with an

average concentration of 2.71 ppm, with a peak detection of 10.55 ppm near the intersection of

Highway 225 and Independence Parkway on March 21, 2019.

17.    In the afternoon of March 22, 2019, two tanks re-ignited sending another plume of

black smoke into the air. Additionally, a containment dike surrounding the tanks collapsed

resulting in the discharge of industrial waste and firefighting foam into a nearby ditch, and

eventually Tucker Bayou and the Houston Ship Channel.  The contents of the ditch ignited and

burned for approximately an hour sending more black smoke and contaminants into the air.

18.    ITC has a long history of state and federal environmental violations. According to

the Texas Commission on Environmental Quality, Intercontinental Terminals Company (ITC) has

been fined for multiple infractions that could have been avoided. In 2008, ITC was fined when a

relief valve failed causing 6,745 pounds of unauthorized butadiene to be released into the

atmosphere due to the facility's failure to prevent an increase in pressure. The Commission said

the event was "avoidable by better operational practices." Butadiene is a carcinogen to humans

and is used to make plastics.

19.    In 2009, ITC was fined for failing to "prevent the overloading of a railcar resulting

in the unauthorized release of 1,452 pounds of toluene, a hazardous air pollutant, during a four-

hour emissions event." This event was also said to be avoidable because the release was due to an operator failing to tighten a bolt on a hatch.

20.     ITC has committed repeated water violations. In 2017, the TCEQ fined ITC for releasing cyanide into the San Jacinto River basin in an amount more than ten times the permitted levels. In 2016, ITC released more than three times the limit for sulfide, and in 2015 ITC was found over the limit for chlorine discharge. Since July 2017, ITC has also failed to file monitoring reports on its chemical services, as required by federal regulations.

21.     ITC concedes that over just the first 24-hour period following the ITC Incident, the fire emitted approximately 6,287,543 pounds of carbon monoxide; 957,116 pounds of naphtha (a flammable liquid hydrocarbon mixture); 889,906 pounds of gasoline blend stock; 460,243 pounds of lube oil; 111,758 pounds of toluene (a water-insoluble liquid predominantly used as an industrial feedstock); 73,824 pounds of nitrogen dioxide; and 3,314 pounds of sulfur dioxide.  At least ten 80,000 barrel tanks containing different petrochemicals burned, and there were weeks of elevated benzene levels resulting in closures to schools, businesses, and infrastructure.

22.     Plaintiff, JASON MINTON was exposed to contaminants from the fire.  Plaintiff has suffered from health problems, including headaches, dizziness, confusion, and anxiety as a result of breathing the toxic cloud released by Defendants. In short, Plaintiff has suffered injuries and damages as a proximate result of Defendants' negligent acts and omissions which resulted in the massive fire subject to this lawsuit.

**B.     The Investigation.**

23.     ITC's post-incident investigation revealed that, on December 4, 2018, ITC employees noticed that the Tank 80-8 pump was "unusually loud."  A subsequent inspection of the pump determined that it was in need of new bearings.  The pump was disassembled, and ITC's

millwrights installed new NSK Model 5313 outboard bearings and NSK Model 6313 inboard bearings to support the pump's shaft. The remainder of the pump was then reassembled and placed into operation on the Tank 80-8 manifold.

24.     On March 17, 2019, the NSK 5313 outboard bearing failed, causing vibrations within the impeller shaft that were directly transmitted to the mechanical shaft seal. This vibration loosened the bolted connections holding the mechanical shaft seal in place. Once the seal broke, the Naphtha escaped into the area around the Tank 80-8 pump, where it ignited and caused the incident.

25.     When the Tank 80-8 pump was taken apart to determine the cause of the incident, investigators observed that the outboard bearing (constructed using NSK 5313 bearings) had come apart, resulting in loose bearing balls and ball remnants in the bearing house, meaning that at the time of the incident the outboard bearing was no longer capable of supporting the mechanical shaft centered in the bearing house. Most of these balls were severely deformed and/or fragmented.

26.     A subsequent metallurgical examination revealed that the Model 5313 outward bearings contained unexplained internal voids, meaning they were not as durable as solid-core ball bearings and were more likely to fail. By contrast, the NSK 6313 inward bearings examined from the incident were solid throughout, as demonstrated by the below diagrams:

**Cross Section of Nominally Intact NSK 5313 Ball Bearing from The Incident:**



**Cross Section of Nominally Intact NSK 6313 Ball Bearing from The Incident:**



27.   Upon information and belief, the design and specifications for the Model 5313 ball bearings did not call for internal voids, but instead called for solid core ball bearings.  The internal voids were therefore a deviation from the intended specifications.

28.   The NSK 5313 ball bearings were sold to ITC by Defendants Allied Industrial Technologies, Inc., The Unlaub Company, and Unlaub / Channel Bearing & Supply, LLC.

## V.    CAUSES OF ACTION

### NEGLIGENCE AND GROSS NEGLIGENCE

*ITC*

29.    Plaintiff incorporates by reference all preceding paragraphs as if fully stated herein and further states as follows:

30.    The acts and omissions of Defendants constitute negligence and gross negligence, and separately and concurrently were a proximate cause of the incident upon which this suit is based, and of the injuries and damages suffered and sustained by Plaintiff. The negligent acts and omissions of Defendants include the following:

a.    Defendants failed to maintain equipment, including the Tank 80-8 manifold and seals;

b.    Defendants failed to have in place a fixed foam fire suppression system for fire prevention, control or direct extinguishment of any flammable or combustible liquid fire within their tanks;

c.    Defendants failed to ensure that foam generating equipment, including the foam concentrate tank and pump were constructed to resist fire and heat, and/or failed to locate the equipment in an area that would be protected from exposure to fire;

d.    Defendants failed to have access to dry chemical and/or foam fire suppression materials to extinguish the fire after it started;

e.    Defendants failed to adequately train workers regarding the hazards of injecting butane into tank manifolds;

f.    Defendants failed to implement written procedures to maintain the ongoing fitness for service of Tank 80-8 injection/circulation piping components;

g.    Defendants failed to use ordinary care in developing and implementing a safety and fire prevention program;

h.    Defendants failed to supervise and train workers to ensure that any safety guidelines in place would be enforced to protect against leaks when injecting butane into tank manifolds;

i.      Defendants caused and permitted the release of volatile organic compounds and chemicals resulting in a continuous toxic cloud over La Porte, Deer Park and other parts of Harris County, Texas;

j.      Defendants failed to use ordinary care in monitoring the release of air contaminants and providing adequate warnings to the community of the release of volatile organic compounds and chemicals, including benzene;

k.      Defendants failed to perform inspections and tests on the Tank 80-8 cargo pump discharge circulation piping and injection point process piping; and

l.      Defendant used process piping on Tank 80-8 that was below the minimum required thickness to inject and mix butane with Naphtha.

31.     Each of the foregoing acts and omissions, when taken separately or together, constitute negligence. Such acts were a direct and proximate cause of the injuries and damages sustained by Plaintiff.

32.     The acts or omissions of Defendants involved an extreme degree of risk of which they had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others. Specifically, Defendants have a long history of incidents involving the release of toxic chemicals, as well as, citations and fines from regulatory agencies. Even after these events, at the time of this catastrophic fire, Defendants operated the facility with institutional ignorance or defiance to a culture of safety and accountability.

33.     The forgoing actions and inactions of Defendants, and/or their respective employees or agents, whether taken separately or together, were of such a character as to constitute a pattern or practice of intentional wrongful conduct or malice resulting in the damages sustained by Plaintiff. These acts or omissions satisfy both the objective and subjective elements of gross negligence which is governed by V.T.C.A., Civil Practice & Remedies Code §§ 41.001(11), 41.003(a). Indeed, Defendants had actual awareness of the extreme degree of risk associated with

the release of toxic chemicals and fires, and nevertheless proceeded with conscious indifference to the rights, safety, and welfare of Plaintiff by failing to act to minimize or eliminate these risks. Therefore, Defendants are guilty of gross negligence for which they should be held liable in punitive and exemplary damages to Plaintiff.

## PRODUCTS LIABILITY

**Manufacturing Defect - NSK Defendants.**

34.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

35.    Defendants NSK Corp., NSK Ltd., NSK Precision, and NSK-AKS ("NSK Defendants"), are engaged in the business of manufacturing and placing into the stream of commerce the NSK 5313 bearings that caused the incident that is the subject of this litigation. As such, the NSK Defendants are "manufacturer[s]" as that term is defined by Section 82.011(4) of the Texas Civil Practice & Remedies Code.

36.    NSK Defendants manufactured the NSK 5313 bearings and placed them into the stream of commerce with the expectation that those bearings would, and in fact did, reach the user or consumer without substantial change in the condition in which the bearings were sold.

37.    A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.

38.    The NSK 5313 bearings, at the time they were placed into the stream of commerce by the NSK Defendants, were in a defective condition unreasonably dangerous to the end-user. Specifically, while the specification for the NSK 5313 bearings required that they contain a solid core, the bearings sold to ITC contained internal voids (*i.e.*, they had a hollow core) of approximately 0.33 inches. These internal voids caused the bearings to have a smaller diameter

than would similar solid-core bearings, as well as an average mass of only 78% of the inboard bearing balls.  This decreased size and mass caused the NSK 5313 ball bearings to deteriorate more quickly than if they had a solid core, causing them to fragment and come loose within the bearing.

39.      This fragmentation caused failure of the outboard bearing, which compromised resistance to thrust loading and generated the impeller shaft vibration that loosened the mechanical shaft seal and allowed the Naphtha to escape.

40.      The failure of the outboard bearing, the vibration of the impeller shaft, the loosening of the mechanical shaft seal, and the release of Naphtha would not have occurred if the NSK 5313 ball bearings—like their NSK 6313 counterparts—were manufactured with a solid core in accordance with their design specifications.  As such, this dangerous condition was a proximate cause of the March 17, 2019 explosion at ITC's Deer Park Facility and Plaintiff's injuries.

**Design Defect - NSK Defendants.**

41.      Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

42.      In the alternative, to the extent that the NSK 5313 ball bearings did not deviate from their design specifications, the NSK Defendants are liable for Plaintiff's injuries because the design of the 5313 ball bearings was defective.  To recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery.

43.      The NSK Defendants' design of the NSK Model 5313 ball bearing was defective because it contained "internal voids" that rendered the bearing unreasonably dangerous for its intended use.  Rather than design the bearing with internal voids, the NSK Defendants should have utilized the solid-core design found in NSK Model 6313.  That this "solid core" alternative design

is safer than the "internal void" design of the NSK 5313 ball bearing is demonstrated by the fact that the NSK 5313 bearings deteriorated and fragmented while the solid-core NSK 6313 bearings did not.

44.     Similarly, the existence and utilization of the NSK 6313 ball bearings in the inboard bearing demonstrates that the solid core design is both technologically and economically feasible.

45.     The "internal void" design was the producing cause of Plaintiff's injuries for the reasons discussed in paragraphs 39-41, *supra*.   As such, the NSK Defendants are liable for Plaintiff's injuries.

**All Products Liability Claims - Applied Technologies, Channel Bearing & Unlaub.**

46.     The allegations contained in paragraphs 31-46, *supra*, are hereby incorporated against Defendants Applied Technologies, Channel Bearing, and Unlaub.

47.     Section 82.001(3) of the Texas Civil Practice and Remedies Code defines "seller" as "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof."

48.     As the distributors of the NSK Model 5313 ball bearings that were sold to and utilized by Defendant ITC, Applied Technologies, Channel Bearing, and Unlaub are "sellers" as defined by the Texas Civil Practice and Remedies Code.

49.     Under Section 82.003 of the Texas Civil Practice & Remedies Code, "[a] seller that did not manufacture a product" may be held liable in a products liability action for any harm caused by that product under certain circumstances.  For example, if "the claimant proves…(a)(7) that the manufacturer of the product is…not subject to the jurisdiction of the court," then the non-manufacturing distributor is liable under Section 82.003(a)(7).

50.    As such, if the Court is unable to exercise jurisdiction over the NSK Defendants—or if Plaintiff proves any other element of Section 82.003—Defendants Applied Technologies, Channel Bearing, and Unlaub are liable for Plaintiff's injuries to the full extent that those injuries resulted from NSK's defective manufacturing and design of the NSK Model 5313 bearings.

## VI. CONTRIBUTORY NEGLIGENCE

51.    Nothing Plaintiff did or failed to do caused or in any way contributed to the cause of the occurrence in question.  The injuries and damages complained of herein were proximately caused as a result of Defendants' respective conduct.

## VII. DAMAGES

52.    Plaintiff would show that as a proximate result of the Defendants' negligence, he has suffered serious and disabling injuries, including the following:

a.    Reasonable medical care and expenses in the past.  These expenses were incurred by Plaintiff for the necessary care and treatment of the injuries resulting from the accident complained of herein and such charges are reasonable and were usual and customary charges for such services in Harris County, Texas;

b.    Reasonable and necessary medical care and expenses which will in all reasonable probability be incurred in the future;

c.    Physical pain and suffering in the past;

d.    Physical pain and suffering in the future;

e.    Physical impairment in the past;

f.    Physical impairment which, in all reasonable probability, will be suffered in the future;

g.    Loss of earnings in the past;

h.    Loss of earning capacity which will, in all probability, be incurred in the future;

i.    Disfigurement in the past;

j.    Disfigurement in the future;

      k.      The cost of future medical monitoring;

      l.      Mental anguish in the past; and

      m.      Mental anguish in the future.

53.      By reason of the foregoing, Plaintiff has been damaged in an amount far in excess of the jurisdictional limits of this Honorable Court. Plaintiff makes a claim for the above-mentioned damages and seeks an amount within the jurisdictional limits of this Honorable Court. Additionally, as a result of the grossly negligent conduct of Defendants, Plaintiff seeks an award of exemplary damages.

## VIII. CONDITIONS PRECEDENT

54.      All conditions precedent to Plaintiff's claims for relief have been performed, have occurred, or have been waived.

## IX. PRE- AND POST-JUDGMENT INTEREST

55.      Plaintiff seeks recovery of pre- and post-judgment interest at the maximum rate allowed by law.

## X.  DEMAND FOR JURY TRIAL

56.      Plaintiff demands a jury trial and tenders the appropriate fee with this Complaint.

## XI.    PRAYER

Plaintiff respectfully requests that Defendants be served with process, that they be required to appear and answer in this lawsuit, and that after a trial or other final hearing on the merits, the Court enter a judgment awarding Plaintiff compensatory damages, as well as, costs, interest, or any other relief, monetary or equitable, to which Plaintiff may be justly entitled.

Respectfully submitted,

**TRACEY FOX KING & WALTERS**

By: */s/ Shawn P. Fox*
      Sean Patrick Tracey
      Texas Bar No. 20176500
      stracey@traceylawfirm.com
      Shawn P. Fox
      Texas Bar No. 24040926
      sfox@traceylawfirm.com
      Lance N. Walters
      Texas Bar No. 24085639
      lwalters@traceylawfirm.com
      440 Louisiana, Suite 1901
      Houston, Texas 77002
      Telephone: (713) 568-3518

**ATTORNEYS FOR PLAINTIFF**