IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLOTTE OWNERS INC. | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | |
| | § | |
| INTERCONTINENTAL TERMINALS | § | C.A. No. 4:19-cv-01460 |
| COMPANY LLC; INTERCONTINENTAL | § | |
| TERMINALS MANAGEMENT COMPANY; | § | |
| CIMA SERVICES, LP; AND | § | |
| INSTRUMENTATION & ELECTRICAL | § | |
| SPECIALIST, L.L.C. | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff, Charlotte Owners Inc. ("Charlotte"), by its attorneys Royston, Rayzor, Vickery & Williams, L.L.P., and files this its Original Complaint against Intercontinental Terminals Company LLC ("ITC"), Intercontinental Terminals Management Company ("ITMC"), CIMA Services, LP ("CIMA") and Instrumentation & Electrical Specialist, L.L.C. ("IES") (collectively, "Defendants") and would respectfully show as follows:

## I.
## JURISDICTION

1.      This is a cause of action within the admiralty and maritime jurisdiction of the United States and this Honorable Court under 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. This claim involves damages arising out of the March 2019 fire at ITC's facility and subsequent oil spill into the Houston Ship Channel.

2.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 and 33 U.S.C. § 2717(b) because Charlotte seeks recovery of damages under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*

3.     This Court has personal jurisdiction over ITC because ITC owns and operates an onshore terminal service facility located at 1943 Independence Parkway South, La Porte, Texas 77571 ("Deer Park Facility") and maintains a corporate office at 1021 Main Street, Suite 1150, Houston, Harris County, Texas 77002. Similarly, this Court also has personal jurisdiction over ITMC, CIMA and IES because they conduct business within this district.

## II.
## VENUE

4.     Venue is proper under 28 U.S.C. § 1391 and 33 U.S.C. § 2717(b), as a substantial part of the events or omissions giving rise to this claim occurred in this judicial district, the discharge or injury or damages occurred in this district, and the Defendants reside, may be found, or have their principal office in this district.

## III.
## THE PARTIES

5.     Plaintiff in the action is Charlotte Owners Inc. Charlotte is a foreign corporation registered in the Marshall Islands. with a business address of Trust Company of the Marshall Islands, Inc., Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Republic of the Marshall Islands, MH 96960.

6.     Defendant ITC is a Delaware limited liability company with its principal place of business located at 1943 Independence Parkway, La Porte, Texas 77571. ITC may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

7. Defendant ITMC is a Texas corporation with its principal place of business located at 2424 Hazard Street, Houston, Texas 77019. ITMC may be served through its registered agent, Norman T. Reynolds, 3262 Westheimer Road, Suite 234, Houston, Texas 77098.

8. Defendant CIMA is a domestic limited partnership with its principal place of business at 790 W. Sam Houston Parkway N., Suite 202, Houston, Texas 77024. CIMA may be served through its registered agent, Bradley W. Rapp, 1980 Post Oak Boulevard, Suite 1200, Houston, Texas 77056.[1]

9. Defendant IES is a domestic limited liability company with its principal place of business at 2417 Randolph Road, Pasadena, Texas 7053. IES may be served through its registered agent Joseph Alger Durso III at 17711 Willow Pond Road, Alvin, Texas 77511.[2]

## IV.
## FACTS

### ITC Fire and the M/T DALI

10. ITC's Deer Park Facility is located on 265 acres situated along the Houston Ship Channel ("HSC").

11. The Deer Park Facility has 13.1 million barrels of capacity in 242 tanks. It stores petrochemical gases and liquids, as well as fuel oil, bunker oil and distillates. The Deer Park Facility advertises capacity for up to five (5) ocean-going tankers and fifteen (15) barges simultaneously.

---

[1] The general partner of CIMA is CIMA Services Management, Inc., which is a domestic corporation with its principal place of business in Houston, Texas.

[2] IES has three members: Joseph A Durso III, Ann Durso and Cassie Achille. All members are individuals domiciled in Texas.

12. Charlotte is the owner of the ocean going crude oil tanker M/T DALI (IMO 9787936)(the "Vessel"). At the time of the incident the Vessel was on charter to Petroineos Trading Limited ("Petroineos").

13. On the morning of March 17, 2019, an above-ground storage tank (No. 80-08) containing naphtha caught fire at the Deer Park Facility in the 2nd 80's Tank Farm. This portion of the facility consisted of fifteen (15) 80,000-barrel capacity above-ground storage tanks.

14. On or about the date of the fire, the M/T DALI arrived at the Houston Fuel Oil Terminal Company (HFOTCO), located just north of the Deer Park Facility. The crew sighted an oil sheen in the water soon after arrival and noted in the vessel's bridge logbook.

15. At the time of the fire, ITC had not equipped the Deer Park Facility with a fixed gas detection system, which would have activated alarms to warn ITC personnel of a product release. As a result, ITC did not know about the naphtha release before the fire. Additionally, ITC did not equip Tank 80-08's piping manifold with emergency or remotely operated isolation valves. As a result, ITC was unable to control the release of naphtha.[3]

16. Before the fire, ITC hired IES and CIMA to revise the butane injection system and piping manifold of Tank 80-08 for the specific purpose of reducing the time required to offload trucks. IES performed the instrumentation and electrical work. CIMA provided the labor and equipment. Rather than replace the 2-inch piping with new 4-inch piping, CIMA installed used piping that was inadequate to serve as a butane injection line. CIMA was also responsible for obtaining all required work permits and conducting inspections and tests on the newly installed

---

[3] *See* U.S. CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD – Factual Update – Storage Tank Fire at Intercontinental Terminals Company, LLC (ITC) Terminal (Published October 30, 2019) § 2.2, available at https://www.csb.gov/assets/1/20/itc_factual_update_2019-10-30.pdf?16522 (last accessed August 17, 2020).

butane injection line. CIMA failed to adequately conduct these inspections and tests. As a result, the butane injection system failed and caused the release of naphtha.[4]

17. The affected tanks contained Oil, as defined by the Oil Pollution Act, 33 U.S.C. § 2701(23), including: naphtha (No. 80-08), pyrolysis gasoline (Nos. 80-07; 80-14; 80-15), gasoline blendstock (Nos. 80-02; 80-03; 80-06), and base oil (No. 80-11).[5]

18. As a result of the initial inferno, eleven (11) of the fifteen tanks (15) collapsed or partially collapsed, causing the discharge of Oil products and presenting a substantial threat of discharge of Oil into the HSC and the navigable waters of the United States.

19. By the early morning hours of March 20, the initial fire at the Deer Park Facility was fully extinguished. Firefighting crews continued to spray foam and water on the tanks to prevent reignition.

20. Around the same time, Charlotte fixed the M/T DALI to China International United Petroleum & Chemicals Co., Ltd. ("Unipec") with an initial laycan[6] of March 22-23. Later, Unipec issued new voyage orders with a revised laycan of March 25-26 to load at Freeport, Texas.

21. On the evening of March 21, the M/T DALI began discharging her cargo at HFOTCO.

22. On March 22, the fire reignited, causing a "catastrophic breach" of the Deer Park Facility's containment wall, which released "an estimated 470,000-523,000 barrels of a mixture of

---

[4] *Id.*

[5] *See* ITC Tank Map, available at https://www.deerparktx.gov/DocumentCenter/View/7267/ITC-Tank-Map?bidId (last accessed August 10, 2020).

[6] Laycan is the period during which the shipowner must tender notice of readiness to the charterer that the ship has arrived at the loading area and is ready to load. The charterer may have the option of cancelling the charter if the ship arrives after the specified period. PETER BRODIE, DICTIONARY OF SHIPPING TERMS 154 (6th ed. 2013); *see generally Stolt-Nielsen Transp. Grp. B.V. v. Edible Oil Trading Corp.,* No. 06 CIV. 0703 (NRB), 2007 WL 194182, at *1 (S.D.N.Y. Jan. 24, 2007).

fire water, firefighting aqueous film forming foams (AFFF), and remaining benzene, ethylbenzene, naphtha, xylene, toluene, pyrolysis gas (pygas) and other refined base oils from the storage tanks … into Tucker Bayou and adjacent waters, sediments, and habitats." The Oil and other chemicals "were carried out by stream flow and tides into the San Jacinto River, Houston Ship Channel, Carpenters Bayou, Old River, Santa Ana Bayou, and surrounding water bodies."[7]

23. ITC's Incident Commander Brent Weber described the Oil discharged into the navigable waters of the United States as "a mixture of the products that were in the tanks before the event occurred, which is primarily in that tank farm: gas blendstocks, naphtha, xylene, and pygas."[8]

24. In response to the containment wall failure, the U.S. Coast Guard closed a portion of the HSC to all vessel movements between Tuckers Bayou and Light 116. Later that the evening, the USCG Sector office ordered the stoppage of all cargo operations in the Houston Ship Channel from Cargill Facility East Terminal to the Cemex USA Terminal, which is between Lights 139 and 129 of the HSC.

25. The M/T DALI was no exception. HFOTCO suspended discharge operations and disconnected the loading arm because of toxic gases detected in the atmosphere.

26. On March 23, the Master of the Vessel issued a Letter of Protest stating, "the vessel's side hull ended up to be oil-stained over its full length on both sides with an oil mark line of abt [*sic*], 0.5-1 meter(s) wide." The Master's Letter of Protest is attached hereto as **Exhibit 1**. A

---

[7] *See* Notice of Intent to Perform a Natural Resource Damage Assessment (August 5, 2019), available at: https://www.cerc.usgs.gov/orda_docs/DocHandler.ashx?task=get&ID=5609 (last accessed August 10, 2020).

[8] *See* Press Conference, ITC Deer Park Fire and Cleanup (March 23, 2019), available at: https://youtube.com/watch?v=Xnzm2OEthJk&feature=youtu.be&t=1467 (last accessed August 10, 2020).

surveyor was also appointed by the vessel's P&I club and attended onboard on March 26 and March 31 to document the incident. The Surveyor's Report is attached hereto as **Exhibit 2**.

27. By the afternoon of March 26, the M/T DALI managed to resume discharging her cargo and completed cargo operations the following morning.

28. The cargo operations were interrupted for several days as a result of the fire at the Deer Park Facility and the resulting toxic fumes and oil spill, causing damages to Charlotte in the form of demurrage costs, loss of charter, and additional bunker consumption. Charlotte also incurred additional agency fees and other port related expenses related to the delay and decontamination.

29. Because of the fire at the Deer Park Facility and resulting spill, oil came into contact with the hull of the M/T DALI, staining the hull, and requiring decontamination and cleaning under orders from the U.S. Coast Guard. It became necessary to shift the M/T DALI to a separate berth to clean the hull prior to departure, leading to additional expenses such as line handlers, tugboats and pilots.

30. Due to the large number of vessels requiring cleaning, the decontamination operations were not completed until the afternoon of April 3. The M/T DALI departed HFOTCO the following evening.

31. As a direct result of the Deer Park Facility fire and oil spill, the M/T DALI was delayed and unable to depart in time to meet the laycan for the Unipec charter. The charter was eventually cancelled, causing more damages to Charlotte in the form of lost charter hire and idle time.

32. Charlotte sought to find a replacement charter but was unable to fix the M/T DALI in the Gulf Mexico or Caribbean regions. Eventually it was necessary to perform a ballast

(unladen) voyage across the Atlantic to find employment. Charlotte incurred damages in the form of bunker expenses required to steam across the Atlantic as well as lost charter hire and idle time.

**Agency Responses to ITC Fire and Oil Spill**



Figure 7: Aerial Image of the Ship Channel Boom Area, 23 March 2019, Flight 10

33. The EPA issued a report entitled "Field Report for Airborne Data Collected in Support of USA EPA Region 6 Intercontinental Terminals Company LLC Fire 23 March 2019." The report included the above image with an explanation stating, "[c]aptured oil behind the boom is evident as is light sheen leakage moving into the channel."[9]

---

[9] *See* Field Report For Airborne Data Collected in Support of US EPA Region 6 Intercontinental Terminals Company LLC Fire (March 23, 2019), available at: https://response.epa.gov/sites/14150/files/ASPECT%20report%20ITC%20Fire%2023%20March%202019%20final.pdf (last accessed August 11, 2020).

63417:45155610.1   8

34. The EPA continued their ASPECT (Airborne Spectral Photometric Environmental Collection Technology) overflights to monitor the air quality and observe the oil sheen in the HSC.[10]

35. On March 25, 2019, "IR images collected over the confluence into the ship channel continued to show boomed oil products with some leakage occurring with sheen being driven to the southwest due to winds. No significant chemical detections were observed on this flight."[11]

36. On March 27, 2019, "the confluence into the ship channel continued to show sheen in the waterway." *Id.* By then, more than half a million gallons of oily water had been skimmed and removed from the HSC and related waterways.[12]

37. On April 12, 2019, "sheen remain[ed] in the boomed areas" and "[a] small amount of sheen leakage was observed migrating into the main channel."[13]

38. The Texas Commission on Environmental Quality ("TCEQ"), the Texas Parks and Wildlife Department, the Texas General Land Office, the National Oceanic and Atmospheric Administration, and the U.S. Department of the Interior (collectively, the "Trustees") can perform a natural resource damage assessment related to the incident. On August 5, 2019, the Trustees issued their intent to perform a damage assessment "resulting from the release of hazardous

---

[10] *See generally* EPA, ASPECT – EPA's Airborne Spectral Photometric Environmental Collection Technology (ASPECT), available at: https://www.epa.gov/emergency-response/aspect (last accessed August 11, 2020).

[11] *See* Field Report For Airborne Data Collected in Support of US EPA Region 6 Intercontinental Terminals Company LLC Fire (April 15, 2019), available at: https://response.epa.gov/sites/14150/files/ASPECT%20report%20ITC%20Fire%2015%20April%202019%20final.pdf (last accessed August 11, 2020).

[12] *See* "Oil, sludge not contained near Deer Park chemical fire, Coast guard says," (March 26, 2019), available at: https://www.click2houston.com/news/2019/03/26/oil-sludge-not-contained-near-deer-park-chemical-fire-coast-guard-says/ (last accessed August 11, 2020).

[13] *See* Field Report For Airborne Data Collected in Support of US EPA Region 6 Intercontinental Terminals Company LLC Fire (April 15, 2019), available at: https://response.epa.gov/sites/14150/files/ASPECT%20report%20ITC%20Fire%2015%20April%202019%20final.pdf (last accessed August 11, 2020).

63417:45155610.1                           9

substances, oil, and other chemicals at and from the ITC Facility into Tucker Bayou and the surrounding area."[14]

39. The Trustees also issued their Preassessment Screen and Determination concluding: "In all, approximately 50 different chemicals regulated under CERCLA, the Clean Water Act (CWA), and OPA were released from the Facility. Thirty-six of the chemicals released are on the EPA's substance Registry Service, 17 are on the Consolidated List of Lists under CERCLA, and 5 are listed on OPA [*sic*] list Of [*sic*] Petroleum and Non-petroleum Oils."[15]

40. The Trustees determined the following OPA products were released into the HSC and the navigable waters of the United States: naphtha, pyrolysis gas (pygas), and other refined oil and petrochemical products including petroleum, distillates (petroleum) hydrotreated heavy paraffinic, and distillates (petroleum) solvent-dewaxed heavy paraffinic.[16]

41. The Trustees also commented they were "unaware of any other exclusion or defense to liability under CERCLA, the Oil Pollution Act (OPA), or other applicable laws."[17]

42. On January 7, 2020, TCEQ published an After Action Review ("AAR") addressing the incident[18] and confirming that the Deer Park Facility fire and resulting oil spill involved the

---

[14] *See* Trustees' Notice of Intent to Perform a Natural Resource Damage Assessment (August 5, 2019), available at: https://www.cerc.usgs.gov/orda_docs/DocHandler.ashx?task=get&ID=5609 (last accessed August 11, 2020).

[15] *See* Trustees' Notice of Intent to Perform a Natural Resource Damage Assessment (August 5, 2019), available at: https://www.cerc.usgs.gov/orda_docs/DocHandler.ashx?task=get&ID=5610 (last accessed August 11, 2020).

[16] *Id*.

[17] Id.

[18] *See* TCEQ After Action Review Report (January 7, 2020), available at: https://www.tceq.texas.gov/assets/public/response/smoke/air/final-ITCFire-AAR-01.07.2020.pdf (last accessed August 11, 2020)

discharge of at least the following OPA products into the HSC: naphtha, pyrolysis gas (pygas), gasoline blendstock, and base oil.[19]

43.     After the discharge, the AAR reported that "[b]ooms were deployed, and the U.S. Coast Guard closed a portion of the SHC between Tucker Bayou and the San Jacinto Monument to Crystal Bay."[20]

44.     The AAR also describes how U.S. Coast Guard personnel were "directly involved in the oversight and management of on-water recovery and remediation efforts of contracted Oil Spill Response Organizations" ("OSRO").[21]

45.     OSRO is a classification established by the U.S. Coast Guard in response to regulatory requirements of OPA. "OSRO is a voluntary program and was developed to assist oil handling facilities and vessels in preparing spill response plans."[22]

46.     According to the AAR, "the UC [Unified Command] and its contracted OSROs recovered 223,882 bbls [barrels] of oily-water petro-chemicals from waterways surrounding the ITC tank farm and HSC."[23] Efforts by the U.S. Coast Guard "led to the successful recovery of over 9.4 million gallons of oily-water petro-chemicals from the HSC and adjacent commercial waterways, as well as the decontamination of 224 vessels."[24]

---

[19]    *Id.* § 2.0
[20]    *Id.* § 2.0
[21]    *Id.* § 3.3.2
[22]    *Id.*
[23]    *Id.*
[24]    *Id.* § 3.4.2

47.  To that end, according to the AAR, "214 response vessels, 142 skimmers, 50 vacuum trucks, and the placement of nearly 168,000 feet of boom were utilized to mitigate the substantial threat to the environment and nationally significant economic waterway."[25]

## V.
## FIRST CAUSE OF ACTION
## NEGLIGENCE AGAINST THE DEFENDANTS

48.  The plaintiff re-alleges and incorporates herein each and every allegation and averment contained in paragraphs 1 through 47 of Plaintiff's Original Complaint with the same force and effect as if it were more fully set forth herein.

49.  The Defendants owed a legal duty to the Plaintiff to safely operate the Deer Park Facility.

50.  Defendants had a duty to exercise ordinary care, meaning the degree of care that would be used by any chemical storage terminal of ordinary prudence under the same or similar circumstances, and Defendants breached that duty, including, but not limited to, one or more of the following ways:

    a.    Failure to develop, implement, and maintain proper operational procedures and protocol concerning safe chemical storage;

    b.    Failure to develop, implement, and maintain proper safety procedures and protocol concerning safe chemical storage;

    c.    Failure to properly maintain chemical storage tanks and related equipment;

    d.    Failure to install proper equipment to prevent and contain a chemical release;

    e.    Failure to adequately prepare for and implement effective procedures to prevent and contain a chemical release and fire;

    f.    Failure to take reasonable action to prevent the chemical release and fire or minimize the effects thereof;

---

[25] *Id*.

  g.  Failure to properly train or manage its agents, servants and employees to handle a chemical release and fire;

  h.  Failure to exercise reasonable care under the circumstances; and

  i.  Other acts of negligence that may be determined as discovery progresses.

51. The Defendants breached their duty to the Plaintiff by failing to maintain safe operations, causing a fire and subsequent oil spill.

52. The careless and negligent conduct of Defendants and the defective equipment of the Deer Park Facility caused the staining on the hull of M/T DALI and subsequent damages to Plaintiff.

53. As a direct and proximate result of the Defendants negligence, the Plaintiff has suffered an injury and sustained damages for which the Defendants are liable.

## VI.
## SECOND CAUSE OF ACTION
## THE OIL POLLUTION ACT (33 U.S.C. § 2701)

54. The plaintiff re-alleges and incorporates herein each and every allegation and averment contained in paragraphs 1 through 47 of Plaintiff's Original Complaint with the same force and effect as if it were more fully set forth herein.

55. The Oil Pollution Act ("OPA") imposes liability upon a "responsible party for a …vessel or a facility from which oil is discharged, or which poses a substantial threat of a discharge of oil into or upon navigable waters or adjoining shorelines" for the damages that result from the incident, as well as removal costs. 33 U.S.C. § 2702(a).

56. ITC is the "Responsible Party," as defined under 33 U.S.C. § 2701(32), for the Deer Park Facility fire and resulting oil spill into the HSC.

57. The Deer Park Facility fire and resulting oil spill into the HSC involved a discharge of Oil under OPA.

58. OPA imposes liability upon a Responsible Party for an incident, meaning "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 2701(14).

59. ITC is strictly liable as the Responsible Party for all the damages resulting from the Deer Park Facility fire and resulting oil spill under OPA.

60. The fire, collapse of storage tanks containing Oil, and subsequent breach of the containment area constitute a series of occurrences that caused a discharge and the substantial threat of a discharge of Oil into the HSC.

61. ITC has no right to limit its liability under any provision of OPA because the incident was proximately caused by its gross negligence or willful misconduct, or the violation of an applicable safety, construction or operating regulation by ITC, an agent or employee of ITC, or a person acting pursuant to a contractual relationship with ITC.

62. As a result of the Deer Park Facility fire and resulting oil spill, Charlotte has a right to recover damages under OPA, which provides for the recovery of the loss of profits or impairment of earning capacity due to the incident.

63. Charlotte has satisfied all conditions precedent to commencement of this action under OPA, including, without limitation, by timely presenting its claim to ITC on January 30, 2020.

64. ITC did not settle Charlotte's claim by payment within 90 days after the date upon which the claim was presented.

65. ITC rejected Charlotte's claim in writing on April 16, 2020 and denied all liability for the claim.

## VII.
## THIRD CAUSE OF ACTION
## DECLARATORY RELIEF

66. The plaintiff re-alleges and incorporates herein each and every allegation and averment contained in paragraphs 1 through 47 of Plaintiff's Original Complaint with the same force and effect as if it were more fully set forth herein.

67. Charlotte made a presentment of its claim under 33 U.S.C. § 2713 by timely submitting a description of its claim and supporting documentation to ITC on January 30, 2020.

68. On April 16, 2020, ITC sent a letter denying Charlotte's claim.

69. ITC denied the claim, arguing Charlotte's damages are unrecoverable under the economic loss rule, and the staining of the hull of M/T DALI does not qualify as physical damage.

70. Based on ITC's rejection of the claim, Charlotte was harmed.

71. An actual controversy exists between Charlotte and ITC concerning the grounds for rejection raised in ITC's letter.

72. Given this actual controversy, Charlotte requests entry of the following declaratory relief:

   a. A declaration that ITC is a Responsible Party under OPA.

   b. A declaration that the Deer Park Facility fire and resulting oil spill involved a discharge of Oil, as defined by OPA, and that OPA and its liability regime applies.

   c. A declaration that the economic loss rule does not bar Charlotte's damages.

   d. A declaration that the staining of the hull of the M/T DALI qualifies as physical damage and is recoverable.

## VIII.
## DAMAGES

73. As a direct result of the Deer Park Facility fire and subsequent oil spill, Charlotte experienced at least **$1,350,613.06** in damages, including economic losses, additional fees,

demurrage, costs and expenses, lost revenue, lost profits, and other damages it would not have experienced but for the incident, including:

    a. **Demurrage** – Upon arrival in Houston the vessel was under charter to Petronieos. The fixture confirmation and charter party provisions are attached as **Exhibit 3** and **Exhibit 4**, respectively. Under the charter party the applicable demurrage rate is $26,000/day. Today, **$5,275** in demurrage costs remain outstanding.

        i. **Extra Agency Expenses** – As a result of the delay, Charlotte incurred additional agency fees and expenses of **$5,200.** An invoice detailing the additional agency fees is attached as **Exhibit 5**.

    b. **Delay and Loss of Next Charter** – After arriving in Houston, Charlotte arranged the next voyage for the M/T DALI with Unipec and an initial laycan of March 22-23. Unipec issued new voyage orders with a revised laycan of March 25-26 to load at Freeport, Texas. The initial charter party agreement and revised voyage orders are attached as **Exhibit 6** and **Exhibit 7**, respectively. As a direct result of the Deer Park Facility fire and oil spill, the M/T DALI was delayed and unable to depart in time to meet the laycan for the Unipec charter. Unipec cancelled the charter, resulting in a loss of **$270,618** based on a freight rate of WS 95 and time charter equivalent rate of $25,530 per day.

    c. **Unladen Voyage** – After Unipec's cancellation, Charlotte was unable to fix the vessel in the Gulf of Mexico or Caribbean regions on such short notice. It was eventually necessary to perform an unladen or ballast voyage across the Atlantic to find employment, resulting in additional idle time of 40.4 days. Over the last sixteen (16) voyages the M/T DALI has earned, on average, $18,623.06 per day, resulting in damages and lost earnings of **$752,371.62**. A summary of the M/T DALI's past sixteen (16) voyages is attached as **Exhibit 8**.

    d. **Bunker Fuel** – While sitting idle in Houston the M/T DALI consumed an additional **$17,193.80** of bunker fuel. While transiting across the Atlantic, the M/T DALI consumed **$274,673** of bunker fuel. A declaration detailing the purchases and consumption of bunker fuel is attached as **Exhibit 9**.

    e. **Shifting Berths for Cleaning** – As detailed above, the U.S. Coast Guard required the M/T DALI shift to another berth to clean the hull prior to departure which resulted in additional expenses:

        i. Pilots – $5,317.72 (invoice attached as **Exhibit 10**)

        ii. Line Handlers – $4,296 (invoice attached as **Exhibit 11**)

        iii. Tug Boats – $13,196.68 (invoice attached as **Exhibit 12**)

    iv.  Surveyor – $2,471.24 (invoice attached as **Exhibit 13**)

## IX.
## CONDITIONS PRECEDENT

74. All conditions precedent have been performed, satisfied or discharged by the Plaintiff.

75. All and singular, the premises of this Original Complaint are true and correct and within the jurisdiction of the United States and this Honorable Court.

## X.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Charlotte Owners Inc. prays that this cause be set for trial before a jury, that they recover judgment of and from the Defendants for the actual damages in such amount as the evidence may show and the jury may determine to be proper, together with prejudgment interest, post-judgment interest, reasonable attorney's fees, costs of court, and such other and further relief to which they may show themselves to be justly entitled.

            Respectfully submitted,

            By: */s/ Dimitri P. Georgantas*
              Dimitri P. Georgantas
              Federal I.D. No. 2805
              Texas State Bar No. 07805100
              1600 Smith Street, Suite 5000
              Houston, TX  77002-7380
              Telephone: (713) 224-8380
              Facsimile: (713) 225-9945
              dimitri.georgantas@roystonlaw.com

              -and-

              Eugene W. Barr
              Federal I.D. No. 1144784
              Texas State Bar No. 24059425
              Blake E. Bachtel
              Federal I.D. No. 3479533

        Texas State Bar No. 24116055  
        The Hunter Building  
        306 22nd Street, Suite 301  
        Galveston, TX  77550  
        Telephone: (409) 763-1623  
        Facsimile: (409) 763-3853  
        eugene.barr@roystonlaw.com  
        blake.bachtel@roystonlaw.com  

**ATTORNEYS FOR PLAINTIFF**

**OF COUNSEL:**

**ROYSTON, RAYZOR, VICKERY & WILLIAMS, LLP**