United States District Court
Southern District of Texas
**ENTERED**
October 06, 2023
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MINTON *et al.,* | § | |
| *Plaintiffs,* | § | |
| v. | § | No. 4:21-cv-00143 |
| | § | |
| INTERCONTINENTAL | § | |
| TERMINALS COMPANY, LLC *et* | § | |
| *al.,* | § | |
| *Defendants.* | § | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | |
| | § | |
| *IN RE*: INTERCONTINENTAL | § | No. 4:19-cv-1460 |
| TERMINALS COMPANY, LLC | § | |
| DEER PARK FIRE LITIGATION | § | |

## OPINION AND MEMORANDUM

This is a mass tort suit arising out of a fire at Defendant Intercontinental Terminals Company LLC's ("ITC") storage tank facility in Deer Park.[1] Pending before the Court is ITC's motion for summary judgment on Plaintiffs' gross negligence claim. ITC's MSJ, ECF No. 270; *see also In re Intercontinental Terminals Company LLC Deer Park Fire Litigation*, 4:19-cv-01460 ("*Munoz*"), ITC's MSJ, ECF Nos. 1466, 1467.[2]

---

[1] On September 29, 2022, based on the parties' consent, this bellwether consolidated case was deconsolidated from the *Munoz* consolidated case and transferred to this Court to conduct all proceedings pursuant to 28 U.S.C. § 636(c). Order Transferring, ECF No. 12; *see also Munoz*, 4:19-cv-1460, Order Transferring, ECF No. 1332. This order is filed in both cases so that the remaining plaintiffs are aware of the actions in this bellwether consolidated case.

[2] Plaintiffs filed a response. Pls.' Response, ECF Nos. 314, 315; Munoz, 4:19-cv-1460, ECF Nos. 1511, 1512. ITC filed a reply. ITC's Reply, ECF No. 303; Munoz, 4:19-cv-1460, ECF No. 1521.

At the hearing on September 27, 2023, the Court announced from the bench that ITC's motion for summary judgment would be denied. This Opinion and Memorandum explains the Court's ruling. After a thorough consideration of the briefing, evidence, and applicable law, the Court finds that there are genuine issues of material fact precluding summary judgment because a reasonable jury could find that ITC's failure to implement remote motor operated valves ("MOVs"), a lower explosive limit monitor ("LEL monitor"), and a deluge system at Tank 80-8 was grossly negligent. Therefore, ITC's motion for summary judgment is denied.

## I.    BACKGROUND

This action concerns a fire at ITC Deer Park that burned from March 17, 2019 to March 20, 2019. Most of the Plaintiffs in the consolidated action are residents of the surrounding community who sued for personal injuries they allegedly suffered because of their exposure to the toxic chemicals released into the atmosphere from the fire ("PI Plaintiffs"). The remaining Plaintiffs are various businesses who have sued for financial damages they allegedly suffered because of the fire's impact on the surrounding area, including the waterways ("Commercial Plaintiffs").

### A.    ITC's HAZOP Assessment

In 2014, ITC installed a butane injection system at Tank 80-8 at ITC Deer Park, which facilitated the combination of injected butane with stored naphtha. ECF Nos. 270-2 at 160, 271-1; *Munoz*, 4:19-cv-1460, ECF Nos. 1511-2 at 160; 1512-1.

As part of the installation, ITC conducted a Hazard and Operability ("HAZOP") assessment that identified hazards the new injection system posed, consequences of those hazards with and without safeguards in place, and recommendations for mitigation of any remaining hazards, which according to ITC policy, had to be initiated within three months to a year. ECF Nos. 315-1 at 13–14; 315-3 at 2; *Munoz*, 4:19-cv-1460, ECF Nos. 1512-1 at 13–14; 1512-3 at 2. On August 13 and 15, 2014, a team at ITC, which included Vice President Carl Holley, reviewed the HAZOP assessment. ECF No. 315-1 at 13–14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 13–14.

To reduce the high risk of catastrophic fire, the HAZOP assessment issued three safety recommendations—installation of: (1) MOVs which are "valve[s] designed, installed, and maintained for the primary purpose of achieving rapid isolation of plant items containing hazardous substances in the event of a failure of the primary containment system including, but not limited to, leaks from pipework, flanges, and pump seals;"[3] (2) LEL monitors which detect flammable gases and trigger an alarm if gas or vapor exceeds a set level;[4] and (3) a deluge system at the pump which could supply water immediately upon fire detection.[5] ITC decided to

---

[3] Carl Holley's Deposition Testimony, ECF No. 315-2 at 300–01; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 300–01.

[4] ECF No. 315-2 at 333; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 333.

[5] ECF No. 315-2 at 333; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 333.

install MOVs in November 2022, eight years later at the next time Tank 80-8 would be taken out of service, but did not assign target dates for installation of any LEL monitors or a deluge system. ECF Nos. 315-1 at 13–14; 315-2 at 142; *Munoz*, 4:19-cv-1460, ECF Nos. 1512-1 at 13–14; 1512-2 at 142. As a result, none of these recommendations were in place at the time of the fire, five years after the HAZOP assessment.

### B.    The Fire

On March 16, 2019, two truckloads of butane were injected into Tank 80-8. ITC Tank Truck Unloading Report, ECF No. 271-43; *Munoz*, 4:19-cv-1460, ECF No. 1467-43. Plaintiffs allege that Tank 80-8's circulation pump ran from March 16, 2019 into the following day, and on the morning of March 17, 2019, the liquid level in Tank 80-8 rapidly decreased without alarm—approximately thirty minutes later, the fire ignited. ECF No. 315-2 at 272, 274, 277; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 272, 274, 277.

Fifteen storage tanks containing chemicals burned—the fire was extinguished days later, on March 20, 2019. Harris County Fire Marshal's Office Report, ECF No. 270-53 at 4; *Munoz*, 4:19-cv-1460, ECF No. 1466-53 at 4. In response to the fire, ITC's emergency response teams arrived on scene and tried to extinguish the fire but were unable to do so. ECF No. 315-2 at 286, 288; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 286, 288. Plaintiffs contend that had the above recommendations

been in place, ITC could have contained the fire and this event would not have been catastrophic. ECF No. 314 at 12; *Munoz*, 4:19-cv-1460, ECF No. 1511 at 12.

### C.    Plaintiffs' Gross Negligence Claims

Plaintiffs bring claims for injuries allegedly suffered because of the fire, including negligence and gross negligence claims against ITC. ECF No. 85; *Munoz*, 4:19-cv-1460, ECF No. 544.

Regarding their negligence and gross negligence claims, the bellwether Plaintiffs enumerated ITC's allegedly negligent acts or omissions, including: failing "to maintain equipment;" failing "to have in place a fixed fire foam suppression system for fire prevention, control or direct extinguishment of any flammable or combustible liquid fire within their tanks;" failing "to have access to dry chemical and/or foam fire suppression materials to extinguish the fire after it started;" causing and permitting the "release of volatile organic compounds and chemicals resulting in a continuous toxic cloud over La Porte, Deer Park and other parts of Harris County, Texas;" and failing to use ordinary care in monitoring the release of air contaminants. . . . " ECF No. 85 ¶ 23; *Munoz*, 4:19-cv-1460, ECF No. 544 ¶ 23. They alleged that "[t]he acts or omissions . . . involved an extreme degree of risk of which they had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others." ECF No. 85 ¶ 25; *Munoz*, 4:19-cv-1460, ECF No. 544 ¶ 25.

## II.   THE STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is appropriate when the movant has established that the pleadings, affidavits, and other evidence available to the court demonstrate that no genuine issue of material fact exists, and the movant is thus entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Bennett v. Hartford Ins. Co. of Midwest*, 890 F.3d 597, 604 (5th Cir. 2018).  A fact is material "if and only if proof of its existence might affect the outcome of the case." *Roy v. City of Monroe*, 950 F.3d 245, 254 (5th Cir. 2020). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine [dispute] of material fact." *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

"Once the moving party has initially shown 'that there is an absence of evidence to support the non-moving party's cause,' the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Houston v. Texas Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quoting *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002). When ruling on

a motion for summary judgment, the Court views all facts and inferences in the light most favorable to the nonmoving party and resolves all disputed facts in favor of the nonmoving party. *Rodriguez v. City of Laredo*, 459 F. Supp. 3d 809, 814 (S.D. Tex. 2020). The Court "may not make credibility determinations or weigh the evidence" in ruling on a summary-judgment motion. *Id.* (quoting *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 150 (2000)).

"Summary judgment cannot be defeated through '[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation.'" *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (quoting *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002)). Rather, it must demonstrate specific facts identifying a genuine issue to be tried to avoid summary judgment. FED. R. CIV. P. 56(e).

## III.   SUMMARY JUDGMENT IS DENIED AS TO PLAINTIFFS' GROSS NEGLIGENCE CLAIM.

ITC contends that Plaintiffs cannot satisfy any element of their gross negligence claim because the record evidence shows that ITC satisfactorily implemented, operated, and maintained its butane injection system at Tank 80-8. ECF No. 270 at 16–17; *Munoz*, 4:19-cv-1460, ECF No. 1466 at 16–17. Plaintiffs assert that "even though ITC will be free to introduce evidence at trial that it exercised safety precautions, that evidence is not conclusive;" instead, the jury should be permitted to decide whether ITC acted with gross negligence because

Plaintiffs have established a genuine issue of material facts as to each element of their gross negligence claim. ECF No. 314 at 14–15; *Munoz*, 4:19-cv-1460, ECF No. 1511 at 14–15.

To prevail on their gross negligence claim, Plaintiffs must prove "both an objective and subjective component of his claim: (1) that viewed objectively from the standpoint of [ITC] at the time of the events underlying this suit, the act or omission of [ITC] involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) [ITC] had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others." *See Alpizar v. John Christner Trucking, LLC*, No. SA-17-CV-00712-FB, 2019 WL 1643743, at *3 (W.D. Tex. Apr. 16, 2019), *report and recommendation adopted*, No. CV SA-17-CA-712-FB, 2019 WL 4087445 (W.D. Tex. May 17, 2019) (citing Tex. Civ. Prac. & Rem. Code § 41.001(11); *U–Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012)).

"[T]he Texas Supreme Court has recognized that 'no exact line can be drawn between negligence and gross negligence.'" *Jezek v. R.E. Garrison Trucking, Inc.*, 637 F. Supp. 3d 445, 450 (N.D. Tex. 2022) (quoting *Wal-Mart Stores v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993)). "The primary difference between gross and ordinary negligence is the mental state of the defendant – conscious indifference – which justifies the imposition of exemplary damages for gross negligence." *Id.*

(citing *McDorman ex rel. Connelly v. Texas-Cola Leasing Co.*, 288 F.Supp.2d 796, 808–10 (N.D. Tex. 2003)). "Otherwise stated, 'the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he did not care.'" *Id.* (citing *McDorman*, 288 F.Supp.2d at 810).

Significantly, an LLC "may be grossly negligent through the acts or omissions of a vice-principal." *Ardoin v. Anheuser-Busch, Inc.*, 267 S.W.3d 498, 504 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 922 (Tex. 1998)); *see also Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp. 3d 640, 656 (S.D. Tex. 2016). "Such vice-principals include corporate officers; those who have authority to employ, direct, and discharge other employees; those engaged in performing the corporation's nondelegable or absolute duties; and those responsible for the management of the whole or a department or a division of the business." *Id.* (citing *Ellender,* 968 S.W.2d at 922). "In determining whether acts are directly attributable to the corporate employer, we do not restrict our review to individual elements or facts but instead consider all the surrounding facts and circumstances to determine whether the corporation itself is grossly negligent." *Id.* (citing *Ellender,* 968 S.W.2d at 922). "These facts and circumstances include reasonable inferences that can be drawn from the corporation's acts or omissions." *Id.* (citing *Ellender,* 968 S.W.2d at 922).

Plaintiffs must prove the elements of their gross negligence claim by clear and convincing evidence. *Alpizar*, 2019 WL 1643743, at *3 (citing *Diamond Shamrock Ref. Co., L.P. v. Hall*, 168 S.W.3d 164, 166 (Tex. 2005)). "The 'clear and convincing' burden 'means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 41.001(2)).

## A.   There Is a Genuine Issue of Material Fact Concerning Whether ITC's Conduct Created an Extreme Risk.

ITC contends that "[t]here is no objective evidence that ITC's conduct leading up to this incident created an extreme degree of risk that such an event would occur" because the record instead shows that ITC identified and analyzed potential hazards and implemented safeguards in deciding to install the butane injection system; developed operating procedures specific to Tank 80-8; trained their employees; remotely monitored Tank 80-8; and employed a multi-faceted maintenance program. ECF No. 270 at 18–19; *Munoz*, 4:19-cv-1460, ECF No. 1466 at 18–19. Plaintiffs respond that ITC's HAZOP assessment demonstrates a fact issue exists as to whether "ITC's failure to install remote MOVs and LEL monitors / deluge at the pumps" "created an objective likelihood of serious injury." ECF No. 314 at 17; *Munoz*, 4:19-cv-1460, ECF No. 1511 at 17. Plaintiffs also point to the testimony of their expert, Michael Felt, and ITC's expert, Earl Crochet, that a loss of containment is a foreseeable risk in terminal operations that can lead to highly destructive

consequences, *i.e.*, a fire that harms workers and the surrounding community. ECF No. 314 at 17; *Munoz*, 4:19-cv-1460, ECF No. 1511 at 17. In reply, ITC argues that Plaintiffs mischaracterize the potential risks identified in the HAZOP assessment. ECF No. 303 at 9–10; *Munoz*, 4:19-cv-1460, ECF No. 1521 at 9–10. ITC also asserts that none of the risks or hazards relate to what happened in the instant case, namely that a defective bearing or loosened bolt led to a pump failure and product leak, and instead, these hazards "are of the more generalized variety." ECF No. 303 at 10; *Munoz*, 4:19-cv-1460, ECF No. 1521 at 10.

"Under the objective component [of a gross negligence claim], 'extreme risk' is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury." *Alpizar*, 2019 WL 1643743, at *4 (quoting *U–Haul Int'l, Inc.*, 380 S.W.3d at 137). "The objective prong (the degree of risk) is viewed from the time of the accident, not in hindsight." *Id.* (citing *N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 128 (Tex. App.—Beaumont 2001, no pet.)). In other words, "[t]he plaintiff must thus show that the defendant's conduct created a strong likelihood of serious harm, 'such as death, grievous physical injury, or financial ruin.'" *Kovaly v. Wal-Mart Stores Tex., LLC*, 157 F. Supp. 3d 666, 670 (S.D. Tex. 2016) (citing *Henderson v. Norfolk S. Corp.*, 55 F.3d 1066, 1070 (5th Cir. 1995) (quoting *Moriel*, 879 S.W.2d at 22)). "*Moriel* requires [plaintiffs] to prove *not only* that the defendants' omissions created a risk of serious harm, but also that the

likelihood of the harm occurring was *more than remote*." *Id.* (emphasis added) (citing *Henderson*, 55 F.3d at 1070). Therefore, to establish the objective element of their gross negligence claim, Plaintiffs must show both an elevated likelihood of harm *and* that the magnitude of the harm was very substantial. *See id.* at 671.

Here, Plaintiffs have produced sufficient evidence to establish a genuine issue of material fact as to whether, viewed objectively from ITC's standpoint at the time of the incident, ITC's failure to implement the HAZOP assessment's recommendations of MOVs, LEL monitors, and a deluge system at Tank 80-8 involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.[6] *See* ECF No. 315-1 at 13–14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 13–14. Plaintiffs proffered sufficient evidence to create a fact issue as to whether ITC's conduct of not implementing MOVs, LEL monitors, and a deluge system created an extreme risk, namely that: (1) the likelihood of harm was more than remote, and according to ITC, could "reasonably be expected to occur;" and

---

[6] As an initial matter, the Court rejects ITC's framing of the extreme risk Plaintiffs' gross negligence claim raises. The Court agrees with Plaintiffs' assessment that ITC mistakenly focuses on the cause of the fire and ignores the fire's containment. ECF No. 314 at 27; *Munoz*, 4:19-cv-1460, ECF No. 1511 at 27. ITC takes too myopic of a view—Plaintiffs have sufficiently specified the extreme risk alleged in this matter: fire, explosions, and fatalities were reasonably expected to occur due to ITC's failure to install MOVs, LEL monitors, and a deluge system at Tank 80-8. ITC has not demonstrated that Plaintiffs are confined in their gross negligence claims to only complain about the initial cause of the fire. Moreover, insofar as ITC seeks to raise any argument related to the sufficiency of Plaintiffs' pleadings, the Court finds that ITC has sufficient notice of Plaintiffs' claims, and further, a motion for summary judgment is not the proper means to assert such argument. *See* FED. R. CIV. P. 8(a), 12(e).

(2) the magnitude of the potential harm was substantial—fire, explosion, and death were possible consequences.

The Court first considers ITC's HAZOP assessment. *See* ECF No. 315-1 at 13–14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 13–14. The HAZOP assessment listed known hazards concerning the process of "unloading butane trucks into [Tank] 80-8," and corresponding consequences, including "fire and explosion," "injuries," and "fatalities." *See* ECF No. 315-1 at 13–14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 13–14. The assessment classified these hazards by their severity and likelihood with and without safeguards, and further recommended mitigation. *See* ECF No. 315-1 at 13–14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 13–14. The team addressing this data and making the recommendations included Carl Holley, ITC's Vice President of Safety, Health, Environmental, Security, and Regulatory Compliance.[7] *See* ECF Nos. 315-1 at 13–14; 315-2 at 8; *Munoz*, 4:19-cv-1460, ECF Nos. 1512-1 at 13–14; 1512-2 at 8.

The HAZOP assessment indicated a "hi level" hazard with "truck unloading" that could possibly lead to the catastrophic consequences of "fire and explosion" and "exposures" without safeguards. But with the implementation of safeguards,

---

[7] There is sufficient evidence to establish that Carl Holley is a vice principal whose knowledge and actions are attributable to ITC. *See Ardoin*, 267 S.W.3d at 504. The evidence shows that Holley was a corporate officer in charge of safety and industrial hygiene, who had numerous direct reports and divisions under his leadership. ECF No. 315-2 at 14, 20, 24; *Munoz*, Cause No. 4:19-cv-1460, ECF No. 1512-2 at 14, 20, 24.

including "procedures, training. . . [and] HiHi alarms," the hazard would remain, but become "unlikely"[8] and therefore, drop to a "medium risk." *See* ECF Nos. 315-1 at 13; 315-3 at 2; *Munoz*, 4:19-cv-1460, ECF Nos. 1512-1 at 13; 1512-3 at 2. Notably, ITC's Risk Matrix did not classify a "medium risk" as an "acceptable risk" and required ITC to "evaluate, develop, and initiate [a] mitigation plan within 1 year." *See* ECF No. 315-3 at 2; *Munoz*, 4:19-cv-1460, ECF No. 1512-3 at 2. To further reduce the recognized risk, the HAZOP team recommended installing "MOVs on all tank valves . . . when the tank is out of service," which they scheduled for November 2022, over eight years after the assessment. *See* ECF No. 315-1 at 13; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 13.

Next, the assessment indicated a "hi level" hazard with "storage and circulation" that could possibly lead to the catastrophic consequences of "fire, explosion, exposures, injuries, fatalities" without safeguards. With safeguards, including "level indication and alarms," the hazard would remain catastrophic, but become "unlikely" and drop to a "medium risk." *See* ECF No. 315-1 at 13; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 13. Again, this classification required the team to "evaluate, develop, and initiate [a] mitigation plan within 1 year." *See* ECF No. 315-

---

[8] According to ITC's Risk Matrix, an "unlikely" risk was one that had "occurred at this facility or a similar facility with this system and/or product in the last 30 years and *may be reasonably expected to occur again at this facility*." ECF No. 315-3 at 2; *Munoz*, 4:19-cv-1460, ECF No. 1512-3 at 2 (emphasis added).

1 at 13; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 13. The team again recommended installing "MOVs on all tank valves," which they scheduled for November 2022, over eight years away. *See* ECF No. 315-1 at 13; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 13.

Also, the HAZOP assessment indicated a "loss of containment" hazard with "storage and circulation" that could possibly lead to the catastrophic consequences of "fire, explosion, exposures, injuries, fatalities" without safeguards. With safeguards, including "monitoring," the hazard would drop to "very serious" and "possible"[9] and a "medium risk." *See* ECF No. 315-1 at 14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 14. As noted above, this classification required the team to "evaluate, develop, and initiate [a] mitigation plan within 1 year." *See* ECF No. 315-1 at 14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 14. The team recommended "consider[ing] projects for LEL meters / deluge at pumps," which they did not set for an action plan or target date. *See* ECF No. 315-1 at 14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 14.

Finally, the assessment indicated a "fire protection equipment" hazard that could possibly lead to catastrophic consequences of "fire, explosion, exposures,

---

[9] According to ITC's Risk Matrix, a "possible" risk was one that had "occurred at this facility or a similar facility with this system and/or product in the last 10 years and *may be reasonably expected to occur again at this facility*." ECF No. 315-3 at 2; *Munoz*, 4:19-cv-1460, ECF No. 1512-3 at 2 (emphasis added).

injuries, fatalities" without safeguards. With safeguards, including "area fire monitors, fire extinguishers, [emergency response team]," the hazard would become "very serious" and "possible" and yield a "medium risk." *See* ECF No. 315-1 at 14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 14. Again, this classification required the team to "evaluate, develop, and initiate [a] mitigation plan within 1 year." *See* ECF No. 315-1 at 14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 14. The team recommended "consider[ing] projects for LEL meters / deluge at pumps," which again they did not set for an action plan or target date. *See* ECF No. 315-1 at 14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 14.

Additionally, Plaintiffs point to the testimony of two experts: Michael Felt and Earl Crochet, both of whom opined that a loss of containment is a foreseeable hazard in ITC's terminal operations that could lead to the devastating consequences of fire, explosion, and fatalities. Felt attested that based on his expertise and review of the case materials, it is "well known in the industry that loss of containment, fire and explosion can propose extreme risk to the life, safety and welfare of persons, the environment and personal property" and ITC acknowledged this foreseeable extreme risk as evidenced by their HAZOP assessment. *See* Michael Felt's Affidavit, ECF No. 314-3 at 3–4, 5; *Munoz*, 4:19-cv-1460, ECF No. 1511-3 at 3–4, 5; *see also* Michael Felt's Report, ECF No. 314-2 at 19 ; *Munoz*, 4:19-cv-1460, ECF No. 1511-2 at 19 (based on his experience, review of the case materials, and independent

research and testing, Felt opined that "ITC's conduct exhibited an extreme degree of risk considering the probability and magnitude of potential harm to workers, damage to property and the health of the surrounding communities"). Also, ITC's expert, Earl Crochet, testified in his deposition that "loss of primary containment is a major risk in terminal operations," which could result in "environmental contamination," "fire," and "risk to safety of workers." Earl Crochet's Tr., ECF No. 315-4 at 57, 58; *Munoz*, 4:19-cv-1460, ECF No. 1512-4 at 57, 58.[10]

The above evidence indicates that there is a genuine issue of material fact regarding "extreme risk." ITC's HAZOP assessment demonstrates that ITC found four possible hazards which may be "reasonably expected" to lead to a fire, an explosion, and fatalities, which is corroborated by expert opinion. As Plaintiffs specify, the HAZOP assessment related to the unloading of butane at Tank 80-8 indicated the following hazards: "high levels of chemicals during unloading, high levels of chemicals during storage and circulation, loss of containment during storage and circulation, and lack of fire protection equipment while the chemicals were sitting." ECF No. 314 at 8; *Munoz*, Cause No. 4:19-cv-1460, ECF No. 1511 at 8. Further, even with ITC's standing safeguards in place, the assessment denoted

---

[10] Although these experts discuss industry knowledge, they do not rely solely on that knowledge in reaching the above conclusions, and further, as discussed more in depth below, Plaintiffs' proffered evidence does not consist solely of the mere knowledge that terminal operations are inherently dangerous.

that each of these hazards carried the severe consequences of a fire, explosion, or fatality, which "may be reasonably expected to occur."

The Court does not find, as ITC suggests, that the extreme risk herein is too generic or too remote to satisfy the objective element of Plaintiffs' gross negligence claim.[11] Rather, the record shows that Plaintiffs' evidence demonstrates "ITC's own assessment specifically identified certain extreme risks." ECF No. 314 at 17; *Munoz*, Cause No. 4:19-cv-1460, ECF No. 1511 at 17. As noted above, ITC's assessment listed specific hazards related to a specific process and indicated that these risks required the initiation of a mitigation plan within a year because they were of severe

---

[11] ITC's citation to *Suarez* and *U-Haul* in support of this point appears to conflate the objective and subjective elements of a gross negligence claim. *See Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015) ("We assume for purposes of our analysis that there is some evidence of an extreme risk considering both the probability and magnitude of the harm. But Suarez's claim fails nonetheless because there is no evidence that Texas City was subjectively aware of perils at the beach that were beyond the ken of a reasonable recreational user."); *U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 139 (Tex. 2012) ("We agree with Waldrip that awareness of an extreme risk does not require proof that the defendant anticipated the precise manner in which the injury would occur or be able to identify to whom the injury would befall. . . . However, Waldrip is not relieved of his burden of showing, by clear and convincing evidence, that [the defendant] had knowledge of the risk . . . .").

Moreover, ITC's other cited cases are inapposite. For example, in *Ung*, the decedent was killed while working on a road crew when he was struck by a loose trailer. Although his supervisor had previously seen another trailer come loose when running over the same pothole, the Court held that the evidence was insufficient to show that the employer, who took extensive steps to control the environment where the incident happened, created a risk so extreme that it created the likelihood of serious injury. *See Universal Services Co., Inc. v. Ung*, 904 S.W.2d 638, 642 (Tex. 1995). The Court found that the employer in *Ung*, unlike ITC, did not have exclusive control over the highway where the incident occurred and did not create the pothole which caused the accident. *See id.* Here, ITC had exclusive control over Tank 80-8's operations and created the extreme risk at issue by failing to timely implement the recommended mitigation. *Ung* does not support ITC's argument that Plaintiffs rely on too generic a risk to meet the objective component of their gross negligence claim.

consequence and may be "reasonably expected to occur." *See* ECF No. 315-2 at 13–14; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 13–14. This is corroborated by Felt and Crochet's expert opinions. *See* ECF Nos. 314-2; 315-4 at 57–58; *Munoz*, 4:19-cv-1460, ECF Nos. 1511-2; 1512-4 at 57–58.

The Court is unconvinced by ITC's argument that the HAZOP assessment at most shows unlikely medium risks, which do not rise to the level of "extreme risk" for gross negligence claims. As Plaintiffs point out, "medium," "possible," and "unlikely" are merely the terms ITC utilized. When looking at ITC's Risk Matrix, these labels still describe hazards linked with severe consequences and may reasonably be expected to occur, such that ITC requires the initiation of a mitigation plan within a year of the assessment. Looking past ITC's arguably misleading labels, a rational factfinder could interpret the HAZOP assessment to reveal extreme risk created by ITC's omission. Furthermore, aside from the HAZOP assessment, both Felt and Crochet opined that based on their industry expertise and review of the case materials, the specific risk of a loss of containment was known, foreseeable, and carried major consequences. ECF Nos. 314-2 at 2–5; 315-4 at 58; *Munoz*, 4:19-cv-1460, ECF Nos. 1511-2 at 2–5; 1512-4 at 58.  Accordingly, a reasonable juror could conclude that, by failing to install the MOVs, LEL monitors, and deluge system, ITC exposed Plaintiffs to extreme risk although ITC labeled it "unlikely medium risk."

The Court is also unconvinced by ITC's argument that because they had some

safeguards in place, but not all the recommended mitigation, there is no genuine issue of material fact as to "extreme risk." Although the Court notes that gross negligence does not arise from failure to implement redundant safety measures, Plaintiffs have produced satisfactory evidence demonstrating that these recommended safeguards were not redundant. Rather, Plaintiffs' evidence shows that the MOVs, LEL monitors, and deluge system could have contained the fire in this case—indeed, ITC recommended this mitigation as necessary to ameliorate the acknowledged risks and even scheduled implementation of some of these safeguards. *See* ECF No. 315-2 at 13–14; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 13–14; *see also* ECF Nos. 314-2; 315-4 at 57–58; *Munoz*, 4:19-cv-1460, ECF Nos. 1511-2; 1512-4 at 57–58.

In sum, there is a genuine issue of material fact that, objectively viewed from ITC's standpoint through the HAZOP team and Carl Holley, unloading butane from trucks at Tank 80-8 without MOVs, LEL monitors, and a deluge system created a more-than-remote risk of fire, explosion, and fatalities.[12] Plaintiffs have put forth

---

[12] ITC points to Mike Gaudet and Marcelo D'Amico's testimony as evidence that these risks posed a "low probability." *Munoz*, 4:19-cv-1460, ECF No. 1466, 19–20. The existence of conflicting testimony does not necessitate summary judgment—Plaintiffs have sufficiently demonstrated there is evidence to the contrary that a reasonable juror may rely on in determining ITC committed gross negligence. *Koerner v. CMR Constr. & Roofing, L.L.C.*, 910 F.3d 221, 227 (5th Cir. 2018) ("All facts and inferences must be viewed in the light most favorable to the non-movant," and it is not appropriate for the court to find the movant's version of the facts more compelling unless the non-movant's version is blatantly contradicted by the record). Furthermore, the fact that a fire, explosion, or fatality had not occurred since the installation of the butane injection system also does not undermine this conclusion. When the record is viewed as a whole, summary judgment is

satisfactory evidence to show that there is a fact question as to whether ITC's conduct in failing to install MOVs, LEL monitors, and a deluge system at Tank 80-8 created an extreme risk of serious injury "reasonably expected to occur."

## B.   There Is a Genuine Issue of Material Fact Regarding Whether ITC Was Subjectively Aware of and Consciously Indifferent To an Extreme Risk.

ITC next contends that "there is no evidence that ITC was subjectively aware of an extreme risk associated with its operation of this equipment, much less the specific risks of which Plaintiffs complain—namely, that a defective bearing or a single loosened bolt for the pump would result in a product leak leading to a fully involved tank farm fire."[13] ECF No. 270 at 6; *Munoz*, 4:19-cv-1460, ECF No. 1466 at 6. ITC continues that its "operating, maintenance, and safety practices negate any possibility of conscious indifference, irrespective of Plaintiffs' allegations that ITC should have implemented different or additional practices." ECF No. 270 at 6; *Munoz*, 4:19-cv-1460, ECF No. 1466 at 6. Citing their numerous safety policies and procedures, ITC asserts that its "overall commitment to safety went beyond simply operating, maintaining, and upgrading its assets" because it also "planned for events like fires and had equipment and personnel onsite to respond in the event of an

---

improper here because a rational juror could find, even though no fire had occurred, that the possibility of a fire occurring was not remote based on evidence that ITC classified the likelihood as "reasonably expected to occur."

[13] As discussed above, the Court does not limit Plaintiffs' gross negligence claim to the cause of the fire.

emergency." ECF No. 270 at 24; *Munoz*, 4:19-cv-1460, ECF No. 1466 at 24. As evidence of ITC's subjective awareness and conscious indifference, Plaintiffs point to VP Carl Holley's deposition testimony and expert Michael Felt's opinions. Plaintiffs conclude that this evidence would support a rational factfinder's conclusion that "ITC chose not to install the necessary safety equipment, despite its actual knowledge that the equipment was needed to reduce the extreme risks created by Tank 80-8," and despite that ITC had installed the equipment on other tanks and at other facilities. ECF No. 314 at 24–25; *Munoz*, 4:19-cv-1460, ECF No. 1511 at 24–25.

"An act or omission that is merely thoughtless, careless, or not inordinately risky cannot be grossly negligent." *Alpizar*, 2019 WL 1643743, at *4 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994), *superseded by statute on other grounds as stated in U-Haul Int'l, Inc.*, 380 S.W.3d 118). "Only if the defendant's act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent; *i.e.*, the situation must be 'highly dangerous.'" *Id.* (citing *Moriel*, 879 S.W.2d at 22; *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993)). A party is not liable for gross negligence when they actually and subjectively believe that circumstances pose no risk to the injured party, even if they are wrong. *Id.* (citing *U–Haul Int'l, Inc.*, 380 S.W.3d at 141). "But '[g]ross negligence does not require proof that the defendant intended or tried to harm the plaintiff.'" *Martinez-*

22

*Gonzalez v. EC Lewisville, LLC*, No. 02-17-00122-CV, 2018 WL 1192242, at *7 (Tex. App.—Fort Worth Mar. 8, 2018, pet. denied) (quoting *Turner v. Franklin*, 325 S.W.3d 771, 784 (Tex. App.—Dallas 2010, pet. denied). Notably, "[e]vidence of 'some care' will not disprove gross negligence as a matter of law." *Id.* (citing *Turner*, 325 S.W.3d at 784; *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001)). "Thus, we look for evidence of the defendant's subjective mental state rather than the defendant's exercise of care." *Id.* (citing *Turner*, 325 S.W.3d at 784).

There is a genuine issue of material fact concerning whether ITC was subjectively aware of and consciously indifferent to an extreme risk associated with its operations at Tank 80-8. Specifically, a rational factfinder could find that ITC knew of the extreme risk discussed above but chose not to implement the recommended mitigation in the five years between the assessment and the fire.

The Court first considers Holley's deposition testimony. Holley was on the team who identified the hazards and consequences related to the unloading of butane trucks at Tank 80-8, and recommended mitigation in the HAZOP assessment. ECF Nos. 315-1 at 13–14; 315-2 at 309; *Munoz*, 4:19-cv-1460, ECF Nos. 1512-1 at 13–14; 1512-2 at 309. With all this information in hand from the assessment, which included that severe consequences were "reasonably expected to occur," Holley and the other team members decided to schedule the installation of MOVs for November 2022, over eight years in the future, and failed to schedule any installation of LEL

monitors or a deluge system. ECF Nos. 315-1 at 13–14; *Munoz*, 4:19-cv-1460, ECF Nos. 1512-1 at 13–14. Notably, Holley testified that he was aware that even with safeguards in place aside from the team's recommended mitigation, the projected consequences of the assessment's hazards remained severe. ECF No. 315-2 at 325; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 325. When asked whether he initiated a mitigation plan within a year of the assessment as required by ITC's Risk Matrix, Holley testified that he and his team complied with policy by *establishing* a mitigation plan within a year of the assessment.[14] ECF No. 315-2 at 320, 334; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 320, 334. Holley also acknowledged that ITC had implemented some of these mitigation items elsewhere in their facilities in Deer Park and Pasadena but delayed implementing them at Tank 80-8 because ITC deemed other tanks more dangerous. ECF No. 315-2 at 334–36; *Munoz*, 4:19-cv-1460, ECF No. 1512-2 at 334–36. Holley's testimony provides evidence that ITC was aware of and even recommended that certain mitigation should be implemented but made the decision to schedule the installation years into the future or not at all.

---

[14] As previously discussed, ITC's Risk Matrix required the team to "evaluate, develop, and initiate [a] mitigation plan within 1 year." *See* ECF No. 315-1 at 14; *Munoz*, 4:19-cv-1460, ECF No. 1512-1 at 14. The Court finds that a rational juror could disagree that merely establishing a mitigation plan complied with the above requirement. By their plain terms, evaluating, developing, and initiating each convey different actions, and by listing them as such, a reasonable juror could conclude that "initiate" would not be fulfilled by *establishing* a mitigation plan. Therefore, the Court is unconvinced by ITC's argument that a rational juror could not find ITC was grossly negligent because ITC created a mitigation plan—especially one that conducted the installation in phases that spanned years.

Plaintiffs also point to Michael Felt's expert opinion. Based on the analysis and testing he conducted, along with his review and evaluation of the case materials, including the HAZOP assessment, Felt opined that:

> Implementation of the aforementioned monitoring systems would have prevented this fire by allowing operators to receive early notice of the leak/abnormal conditions at Tank 80-8 on March 17, 2019, i.e., prior to the initiation of the fire. Monitoring and control systems of the type discussed were technologically and economically feasible prior to this fire and would not have compromised the utility of Tank 80-8.

ECF No. 314-3 ¶ 20; *Munoz*, 4:19-cv-1460, ECF No. 1511-2 ¶ 20. Felt also noted that in addition to being technologically and economically feasible, the necessary instrumentation and controls were "commonly utilized throughout the industry." ECF No. 314-3 ¶¶ 18, 21; *Munoz*, 4:19-cv-1460, ECF No. 1511-2 ¶¶ 18, 21. Specific to MOVs, Felt stated that ITC installed MOVs on "several adjacent tanks in the farm," but "all nozzle valves on Tank 80-8 were manually operated," making any remotely opening or closing of the valves impossible. ECF No. 314-3 at 17, 18. Felt concluded:

> ITC's inadequate maintenance procedures, in concert with their failure to employ the necessary instrumentation and controls (commonly utilized throughout the industry) are the proximate cause(s) of this fire. Furthermore, ITC's conduct exhibited an extreme degree of risk considering the probability and magnitude of potential harm to workers, damage to property and the health of the surrounding communities. ITC had actual subjective awareness of the risk involved but nevertheless proceeded with indifference to the safety of workers and the surrounding communities.

ECF No. 314-3 ¶¶ 20, 21; *Munoz*, 4:19-cv-1460, ECF No. 1511-2 ¶¶ 20, 21.

Here, there is a genuine issue of material fact as to whether ITC had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. Plaintiffs have produced sufficient evidence of the requisite culpable mental state to survive summary judgment. Their evidence demonstrates that ITC knew their safeguards did not ameliorate the potential severe risks their operations at Tank 80-8 posed; ITC recommended additional safety measures to lower those risks; but ITC decided not to implement those measures until years in the future or not to implement them at all. ITC clearly believed that these mitigation items were useful because they recommended their implementation at Tank 80-8 and even installed them in other areas of ITC's operations.

ITC's cited cases do not alter this conclusion. For example, in *Diamond Shamrock*, the Texas Supreme Court found that although other safety measures and other actions could have been taken to prevent the incident in that case, the safety measures in place had protected against the risk for fifteen years. Therefore, because the measures were seemingly effective, the defendant's failure to install redundant safety measures did not establish gross negligence. *Diamond Shamrock*, 168 S.W.3d at 172. Here, the record does not demonstrate that the recommended safety measures were redundant—to the contrary, the record supports finding that they were necessary. In fact, ITC even recommended them as necessary, but delayed their

installation. ITC's five years without incident does not compare to three times as long as in *Diamond Shamrock*.

The instant case is more akin to *Lee Lewis Constr. Inc. v. Harrison,* 70 S.W.3d 778, 786 (Tex. 2001) and *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 925 (Tex. 1998)—in both of those cases, the courts found sufficient evidence of the subjective element where, like here, safety measures were available to the defendant, but were not utilized due to the conscious decisions of those in charge.[15]

The Court is also unconvinced that the extreme risk here is too general to satisfy the subjective element of Plaintiffs' gross negligence claim. In support of this argument, ITC cites *Boren v. Wal-Mart Stores Tex., LLC*, No. 4:16-CV-2006, 2018 WL 1382502, at *3 (S.D. Tex. Mar. 16, 2018). *Boren* is distinguishable because in that case, the court found that a stray wet wipe on the store's floor that did not appear

---

[15] Moreover, ITC's liturgy of various safety policies, procedures, trainings, and precautions implemented in place of the recommended mitigation does not make this issue one suitable for summary judgment. Notably, "[e]vidence of 'some care' will not disprove gross negligence as a matter of law." *Martinez-Gonzalez*, 2018 WL 1192242, at *7 (quoting *Turner*, 325 S.W.3d at 784). ITC's cited cases are inapposite and do not demonstrate that summary judgment is appropriate here based on ITC's safety policy and training. *See Barber v. Texaco, Inc.*, 720 F.2d 381, 384 (5th Cir. 1983) (plaintiff's theory that defendant did not care about emissions was undercut by evidence adduced at trial that defendant installed warning signs and a monitoring and alarm system to keep emissions at a safe level; in deciding gross negligence claim, the court did not discuss additional safety measures not taken by defendant); *Petri v. Kestrel Oil & Gas Properties, L.P.*, 878 F. Supp. 2d 744, 760, n.11 (S.D. Tex. 2012) (the court granted summary judgment on the plaintiff's gross negligence claim where there was no "competent, legally sufficient evidence to support the objective or subjective elements" because the record instead showed the plaintiff "did not act reasonably for his own safety" by failing to follow the defendant's safety policies); *Guadalupe-Blanco River Auth. v. Pitonyak*, 84 S.W.3d 326, 341-42 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) (in dicta, the court noted that perhaps a sign warning boaters of dangerous currents "would appear to negate a claim of conscious indifference.").

on security footage and was passed numerous times by store employees, did not establish that Wal–Mart was aware of the wet wipe and nevertheless acted with conscious indifference. 2018 WL 1382502, at *3.[16] Whereas here, by and through the HAZOP assessment and scheduled mitigation, ITC was aware of the extreme risk and consciously decided to delay installation of the MOVs, LEL monitors, and deluge system, or not install them at all.

In sum, the Court finds that there is a genuine issue of material fact as to whether ITC acted with conscious indifference when it identified certain severe risks and how to remedy those risks but put off implementing those remedies until years into the future or failed to schedule implementation at all.

## IV.   CONCLUSION

While Plaintiffs' evidence may not ultimately prevail at trial, the Court cannot conclude on the current record that no reasonable jury could find that ITC was grossly negligent. It is for the jury to consider the record evidence, weigh the credibility of testimony, and then ultimately decide whether ITC was grossly negligent in failing to implement MOVs, LEL monitors, and a deluge system at Tank 80-8. Making all reasonable inferences in Plaintiffs' favor, the Court concludes

---

[16] ITC also cites *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015) in support of this argument, but for the same reasons above, this case is inapposite. In *Suarez*, the Texas Supreme Court found no evidence of subjective awareness where the plaintiff's evidence consisted of general knowledge that marine activities are dangerous. *Suarez*, 465 S.W.3d at 634. Here, the HAZOP assessment specified risk far more specific than the general dangerousness associated with terminal operations.

that a reasonable jury could find that Plaintiffs' evidence demonstrates that, viewed objectively from ITC's standpoint at the time of the fire, ITC's failure to implement MOVs, LELs, and a deluge system involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and, ITC had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. Thus, Plaintiffs have sufficiently raised an issue of fact regarding the elements of their gross negligence claim against ITC.[17]

Therefore, the Court **DENIES** ITC's motion for summary judgment, ECF No. 270; *Munoz*, 4:19-cv-1460, ECF No. 1466.

Signed on October 5, 2023, at Houston, Texas.


_____
**Dena Hanovice Palermo**
**United States Magistrate Judge**

---

[17] ITC expresses concern about the jury hearing evidence related to Plaintiffs' gross negligence claim and then improperly attributing it to Plaintiffs' negligence claim. At this juncture, the Court is confident that its instructions on the applicable law can dispel any potential confusion. *See Mack v. State*, No. 06-06-00222-CR, 2007 WL 1435003, at *2 (Tex. App.—Texarkana May 17, 2007, no pet.) ("we generally presume the jury follows the trial court's instructions in the manner presented.").